# IN THE SUPREME COURT OF IOWA

No. 05–1344

Filed May 1, 2009

**STATE OF IOWA,**

    Appellee,

vs.

**KYLE MICHAEL CROMER,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Muscatine County, Patrick J. Madden, Judge.

Defendant seeks further review of court of appeals decision affirming judgment of conviction for sexual abuse in the third degree. **DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF CONVICTION REVERSED; SENTENCE VACATED AND CASE REMANDED FOR NEW TRIAL.**

Kent A. Simmons, Davenport, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, Gary R. Allison, County Attorney, and Dana Christiansen, Assistant County Attorney, for appellee.

**CADY, Justice.**

In this direct appeal from a judgment of conviction for sexual abuse in the third degree entered by the district court following remand from an earlier appeal after a jury trial, we must decide whether the defendant is entitled to a new trial based on several claims of error, including ineffective assistance of trial counsel. On our review, we reverse the judgment and sentence of the district court and remand the case for a new trial.

## I. Background Facts and Proceedings.

The relevant facts and circumstances of this case began when Kyle Cromer went to the "Wooden Nickel" tavern in Wilton, Iowa, on a Saturday night in March 2003. He had been drinking alcoholic beverages earlier in the day. As the evening progressed, the tavern became densely populated with patrons, who had come to enjoy the live music of a band and the merriment of the occasion. A woman whom we identify as N.S.[1] was among the group of patrons that evening. She attended a wedding earlier in the day and had consumed numerous beers prior to arriving at the tavern. She was accompanied by several friends. Many of the patrons were friends or acquaintances, including Cromer and N.S. Cromer was with Donnie Schultheis, who was a distant relative of N.S.

Like many of the other patrons, Cromer, Schultheis, and N.S. consumed copious amounts of alcoholic beverages during the evening, including shots of liquor. They became extremely intoxicated. N.S. danced in a provocative manner with Cromer and Schultheis at various times during the evening, which included some touching and fondling below the waist.

---

[1]We have in the past protected the identity of the complaining witness in our written opinions involving crimes of sexual abuse, and we choose to do so under the circumstances of this case as well. *See State v. Knox*, 536 N.W.2d 735, 736 (Iowa 1995) (identifying complaining witness in sex-abuse case only as "complainant"); *State v. Plaster*, 424 N.W.2d 226, 227 (Iowa 1988) (identifying complaining witness in sex-abuse case by first name only).

Sometime after midnight, N.S. left the tavern with Cromer and Schultheis after telling a girlfriend the two men were going to give her a ride home. They left in Schultheis' car. At this point, N.S. lost the ability to recall the remaining events of the evening. However, she awoke the next morning in a room at the Muskie Motel in Muscatine. She was naked and lying on a bed between Cromer and Schultheis. She located most of her clothing in the bathroom of the motel room and discovered her underwear and shoes in Schultheis' car. After arriving home, numerous fingerprint-sized bruises could be observed on her arms and inner thighs. She had a lump on her forehead and a bruise on her jaw. She was upset and crying.

A week later, N.S. reported the incident to the police. At the suggestion of police, N.S. called Cromer on the telephone. She had not talked to him since the incident. The police prepared N.S. for the call by suggesting topics of conversation, and two detectives were present and coached her at times during the conversation. They also suggested many of the questions propounded by N.S. and prodded her to keep talking when the conversation ebbed. The entire fifty-minute conversation was recorded onto a police computer.

N.S. began the conversation by calmly telling Cromer she could not remember the events of the evening and asked Cromer to tell her what happened. Cromer mentioned he was extremely intoxicated and could not precisely remember the evening's events, but he did allude to sexual activity between them. As the conversation progressed, N.S. began to alternate between periods of composure and periods of intense anger and sadness. She repeatedly told Cromer he took "advantage of" her. N.S. also emotionally related that she was plagued by painful thoughts about the incident and felt "dirty." She lamented that she would be required to live with her feelings the remainder of her life. She also told Cromer she could not sleep at night and

had nightmares of resisting an attack by two men. He searched for words of consolation, but was unsuccessful.

Eventually, N.S. told Cromer she would never have consented to engaging in sexual intercourse with two men at the same time and demanded to know exactly what happened at the motel. In response, Cromer described in more detail how he and N.S. engaged in oral sex and sexual intercourse at the motel. N.S. repeatedly expressed her belief that she must have been unconscious and unable to make any decision to engage in sexual intercourse that evening. Midway through the conversation she began to accuse Cromer of rape and date rape.

Cromer repeatedly replied to her accusations of rape and date rape by saying, "It wasn't like that." Thirty minutes into the conversation, N.S. emotionally demanded to know what Cromer would call the incident if it had happened to his sister. At first, Cromer refused to call such an incident date rape. A few minutes later, however, N.S. again demanded to know how Cromer would describe their sexual encounter. After Cromer admitted he "took advantage of a drunk girl," N.S. pressed for him to acknowledge he engaged in date rape. She pleaded with him to acknowledge his conduct for her benefit and well-being. Minutes later, approximately forty minutes into the conversation, Cromer agreed he would call the encounter "date rape" if it had happened to his sister. He also told N.S. he should not have taken advantage of her.

Throughout the conversation, N.S. told Cromer she trusted him and Schultheis because she had known them for many years. She also repeatedly told him any decent person would have taken her home. Near the end of the conversation, she began to cry and told Cromer that she "should have been safe with you guys." Overall, the conversation was emotionally charged, and N.S. doggedly pressured Cromer to acknowledge culpability.

Seven months later, Cromer was charged with the sexual abuse of N.S. The case proceeded to trial where various witnesses, including N.S. and Cromer, testified to the events of March 29. Numerous patrons at the tavern testified to the level of intoxication N.S. exhibited before she left the Wooden Nickel that evening. Some witnesses said she was having difficulty walking and, at times, even standing, while other witnesses said she was inebriated but coherent and generally under control. All witnesses agreed N.S. was engaged and enjoying herself. Yet, she testified she had no memory of the evening from the time she left the bar with Cromer and Schultheis until awakening the next morning. A certified substance abuse counselor testified about a condition commonly known as "blackout." The expert described blackout as a loss of memory caused by rapid intoxication where an intoxicated person is awake and functioning during the blackout period.

Cromer admitted he and Schultheis engaged in various sex acts with N.S., but denied she was unconscious, mentally incapacitated, or physically helpless. Cromer testified N.S. initiated the sex acts and was at all times a willing participant. He said the sex acts began in the car and continued after the three checked into the motel. He also said they took a group shower before retiring to bed. However, an acquaintance of Cromer's who was in the jail for a brief period of time with Cromer after his arrest testified Cromer admitted to him that N.S. was unconscious when Cromer and Schultheis performed sex acts on her at the motel. This acquaintance of Cromer's received a reduced sentence in a case involving unrelated criminal charges in exchange for his testimony.

The recording of the telephone conversation between Cromer and N.S. was admitted into evidence and played in its entirety to the jury. Trial counsel made no objection to the admission of the recorded conversation.

The district court submitted the case to the jury on three separate counts. Count I required the State to prove sexual abuse in the second degree, a class "B" felony under Iowa Code section 709.3(3) (2003).[2] Count II required the State to prove sexual abuse in the third degree, a class "C" felony under section 709.4. The only theories of sexual abuse submitted to the jury under this count were based on mental incapacitation or physical helplessness of the other person.[3] Count III required the State to prove Cromer committed assault with the intent to commit sexual abuse and causing bodily injury, a class "D" felony under section 709.11.

The jury convicted Cromer of count II—sexual abuse in the third degree based on the mental incapacitation or physical helplessness of the other person—and acquitted him on counts I and III. Cromer then moved for a new trial. He contended, in part, the district court erred in failing to instruct the jury that he could not be convicted unless it was shown he knew N.S. was incapacitated due to intoxication. He also argued insufficient evidence to support the verdict.

The district court granted the motion for new trial on the ground that it had failed to properly instruct the jury. The district court did not address the sufficiency-of-the-evidence claim.

The State sought discretionary review from the district court decision to grant a new trial, and we transferred the case to the court of appeals. The court of appeals held Cromer did not need to have knowledge N.S. was incapacitated for the jury to convict him of sexual abuse under the mental-incapacitation and physical-helplessness alternatives. Consequently, it

---

[2]Unless noted otherwise, all statutory references are to the 2003 Iowa Code.

[3]Iowa Code section 709.4 provides, "A person commits sexual abuse in the third degree when the person performs a sex act . . . while the other person is mentally incapacitated, physically incapacitated, or physically helpless."

determined the district court did not err in instructing the jury. Additionally, the court of appeals found Cromer waived review of his claim of insufficient evidence by failing to request a ruling on the claim by the district court after it granted a new trial. The court of appeals remanded the case to the district court "for entry of judgment of conviction."

On remand, Cromer filed a new motion for new trial. He again asked the district court to grant a new trial based on insufficient evidence and sought additional review on other grounds. The district court determined the claim of insufficiency of the evidence could not be considered nor decided. It found it had no authority to decide the question in light of the mandate issued by the court of appeals to enter a judgment of conviction. Consequently, the district court entered judgment and imposed sentence. Cromer was sentenced to an indeterminate term of incarceration not to exceed ten years.

Cromer again filed an appeal, which is the appeal presently before us. He claims the district court should have granted his motion for a new trial based on the insufficiency of the evidence. He also claims his counsel was ineffective for failing to obtain a ruling on the sufficiency of the evidence and in failing to object to the admission into evidence at trial of the recorded telephone conversation between Cromer and N.S.

We transferred the case to the court of appeals. It found the sufficiency-of-the-evidence claim was not before the district court on remand and affirmed the ruling entered by the district court. In addition, the court of appeals found the record was inadequate to decide the claims of ineffective assistance of counsel. We granted further review.

## II. Standard of Review.

We review the postremand actions of the district court in carrying out a mandate of an appellate court for legal error. *Winnebago Indus. v. Smith,*

548 N.W.2d 582, 584 (Iowa 1996). We review ineffective-assistance-of-counsel claims de novo. *State v. Horness*, 600 N.W.2d 294, 297 (Iowa 1999).

### III. Sufficiency of Evidence.

The only claim of trial court error raised on direct appeal in this case is whether the district court properly refused to decide Cromer's challenge, on remand, to the sufficiency of the evidence to support the conviction. The other claims of error raised by Cromer pertain to ineffective assistance of trial counsel. While defendants in criminal cases are not required to raise claims of ineffective assistance of counsel on direct appeal to preserve the claims for postconviction relief, such claims may nevertheless be raised on direct appeal. Iowa Code § 814.7(2) (2009). When raised in a direct appeal, we can proceed to decide them if the record is adequate for our review. *Id.* § 814.7(3).

Because we ultimately conclude Cromer is entitled to a new trial based on the failure of his trial counsel to object to the admission of the recorded telephone conversation, we do not need to decide the claim of trial error raised by Cromer on direct appeal.[4] Accordingly, we proceed to consider the ineffective-assistance-of-counsel claim.

---

[4]We agree with Cromer that his claim to a new trial based on insufficient evidence was not waived by failing to request a ruling from the district court. After the district court granted a new trial based on legal error in the jury instructions, Cromer was not required to request an additional ruling prior to the first appeal in order to preserve the claim to a new trial based on the alternative ground of insufficient evidence. A successful party in district court is not required to request the district court to rule on alternative grounds raised, but not relied upon by the district court in making its ruling, in order to assert those grounds in support of affirming the ruling of the district court when appealed by the opposing party. *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 774 n.3 (Iowa 2009) (citing *Moyer v. City of Des Moines*, 505 N.W.2d 191, 193 (Iowa 1993)). Thus, the court of appeals erred in concluding otherwise in the first appeal. Nevertheless, this ruling became the law of the case on remand, whether the ruling was right or wrong. *See State ex rel. Goettsch v. Diacide Distrib., Inc.*, 596 N.W.2d 532, 537 (Iowa 1999) ("Pursuant to this rule, 'legal principles announced and the views expressed by a reviewing court in an opinion, right or wrong, are binding throughout further progress of the case upon the litigants, the trial court and this court in later appeals.' " (quoting *State v. Grosvenor*, 402 N.W.2d 402, 405 (Iowa 1987))). Consequently, while the district court had authority to consider a motion for new trial prior

#### IV. Ineffective Assistance of Counsel.

First, Cromer argues trial counsel was ineffective in failing to object to the introduction of the recorded telephone conversation into evidence at trial. He asserts many of the statements made during the conversation were inadmissible for four independent reasons, and his counsel failed to fulfill an essential duty to object to admission of the recording. He points to various statements on the tape and argues (1) the probative value of some of the statements was substantially outweighed by their unfairly prejudicial effect on the jury, (2) other statements constituted improper lay opinions or opinions on legal standards, (3) some statements were coerced, and (4) other statements constituted inadmissible hearsay. The State argues defense counsel could have refrained from objecting to the offer of the recorded conversation based on reasonable trial strategy, and in any event, any error did not result in prejudice.

**A. Elements of Ineffective Assistance of Counsel.** Generally, claims of ineffective assistance of counsel made on direct appeal will be preserved for postconviction relief actions. *Horness*, 600 N.W.2d at 297. However, "we will consider such claims on direct appeal where the record is adequate." *Id.*; *see also* Iowa Code § 814.7(3) (2009) ("If an ineffective assistance of counsel claim is raised on direct appeal from the criminal proceedings, the court may decide the record is adequate to decide the claim or may choose to preserve the claim under chapter 822 [postconviction proceedings].").

In addressing ineffective-assistance-of-counsel claims, we recognize the "[d]efendant has the burden of proof to establish by a preponderance of the evidence that counsel rendered ineffective assistance." *State v. Aldape,*

---

to entering its judgment on remand, *see* Iowa R. Crim. P. 2.24(4), it could only consider those grounds for new trial collateral to the appeal.

307 N.W.2d 32, 42 (Iowa 1981). The successful ineffective-assistance-of-counsel claim requires proof by a preponderance of the evidence that (1) counsel failed to perform an essential duty, and (2) prejudice resulted. *Horness*, 600 N.W.2d at 298.

**B. Trial Counsel's Failure to Perform an Essential Duty.** In analyzing the first prong of the test, we presume counsel acted competently. *Id.* We also require more than mere "[i]mprovident trial strategy, miscalculated tactics, mistake, carelessness or inexperience," as viewed with the clarity of hindsight. *Parsons v. Brewer*, 202 N.W.2d 49, 54 (Iowa 1972). Instead, we ask whether "counsel's performance fell below the normal range of competency." *Horness*, 600 N.W.2d at 298. "[D]efense counsel has not failed to perform an essential duty when counsel fails to raise a claim or make an objection that has no merit." *Id.* Consequently, to determine whether counsel failed to perform an essential duty in failing to object to introduction of the audio-recorded telephone conversation, we can first analyze whether the conversation was admissible under our rules of evidence.

Cromer does not argue the entire audio-recorded conversation was inadmissible. For example, he concedes some statements were relevant and acknowledges his statements constituted admissions, or nonhearsay statements. *See* Iowa R. Evid. 5.801(d)(2) ("Admission by party-opponent"). Likewise, he does not argue all of the statements made by the complaining witness were inadmissible. Cromer also does not make a statement-by-statement attack on the admissibility of the recording, delineating exactly which statements were admissible and which were inadmissible. Instead, he provides examples of those statements he claims were inadmissible under various rules of evidence and that presented the greatest opportunity for the trial to result in injustice.

1. *Rule 5.403 balancing.* Cromer first argues certain statements were inadmissible because their probative value was substantially outweighed by their unfairly prejudicial effects. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues . . . ." Iowa R. Evid. 5.403. In determining whether evidence should be excluded from a trial under rule 5.403, we first consider the probative value of the evidence. *See State v. Harmon*, 238 N.W.2d 139, 145 (Iowa 1976) (explaining courts' duty to " 'first, [decide] whether the offered evidence has some probative force, and second, to balance the value of that evidence . . . against the danger of its prejudicial or wrongful effect upon the triers of fact' " (quoting *State v. Wallace*, 259 Iowa 765, 770, 145 N.W.2d 615, 619 (1966))).

The probative value of evidence is different than the "relevancy" of evidence. Relevancy relates to the tendency of evidence "to make a consequential fact more or less probable." *State v. Plaster*, 424 N.W.2d 226, 231 (Iowa 1988). On the other hand, the "probative value" of evidence "gauges the strength and force of that tendency." *Id.*

The crux of this case dealt with whether N.S. was a willing participant in the sex acts or was mentally incapacitated at the time, or physically helpless, due to her intoxication. Several statements made by Cromer and N.S. during the telephone conversation clearly tended to strengthen the probability that N.S. was mentally incapacitated or physically helpless. Yet, the statements by Cromer that add to the probative value of the evidence were made in response to an emotional plea by N.S. to make the statements.

In *State v. Quintero*, 480 N.W.2d 50, 52 (Iowa 1992), we pointed out that coercion used to obtain an admission from an accused is not only relevant to a constitutional analysis of the admission of evidence, but is also relevant to the balancing of the probative value and the prejudicial effect

under Iowa Rule of Evidence 5.403. Coercion diminishes the reliability of an admission because "the law has no way of measuring the improper influence or determining its effect on the mind of the accused." *Quintero*, 480 N.W.2d at 52. Of course, coercion can come in many forms.

In this case, the conversation between Cromer and N.S. was very emotional. The two were longtime friends, and N.S. was distraught. She looked to Cromer to help piece together the events of the evening and to help her deal with her personal suffering. The effect of this emotion on Cromer was apparent over the course of the conversation. N.S. repeatedly appealed to their friendship, recounted her feelings of shame, and told of her nightmares and inability to sleep. She also forcefully exclaimed she would never have consented to intercourse with two men, declared she must have been unconscious, and continuously told Cromer he took advantage of her and raped her. In the face of her intense emotion and anger, Cromer gradually began to agree with the accusations leveled by N.S.

At the same time, police officers were present and coaching N.S. throughout the phone call. The police officers prepared N.S. for the call by suggesting many of the questions she asked Cromer, including the question about what Cromer would call the situation if it happened to his sister. They also used hand motions to prod N.S. to keep talking when the conversation subsided.

Consequently, the probative value of the statements made during the conversation was ultimately diminished by the coercive environment. Under a rule 5.403 analysis, this environment tended to make the statements less probative of the ultimate issue.[5]

---

[5]We are not deciding whether the actions by the police officers in orchestrating the telephone conversation rendered the entire statement inadmissible as coercive under due-process standards. *Cf. State v. Morgan*, 559 N.W.2d 603, 608–09 (Iowa 1997) (addressing voluntariness of confession claimed to be coerced in violation of constitutional due process);

We next turn to balancing the probative value of the challenged evidence against any unfair prejudice that may accompany the evidence. *Harmon*, 238 N.W.2d at 145. The admission of the recorded conversation without objection, or a request for a limiting instruction, carried at least two pieces of harmful baggage—risk of unfair prejudice and risk of confusion of issues. " ' "Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " *Old Chief v. United States*, 519 U.S. 172, 180, 117 S. Ct. 644, 650, 136 L. Ed. 2d 574, 588 (1997) (quoting Fed. R. Evid. 403 advisory committee's note[6]). In the context of a criminal case, unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Id.* at 180, 117 S. Ct. at 650, 136 L. Ed. 2d at 587–88.

Here, N.S. repeatedly and emotionally stated her opinion that Cromer took advantage of her. N.S. presented herself as a sympathetic, suffering victim, as shown by such comments as decent guys would have taken her home and that "little pieces" of her had been "taken away." Conversely, these statements suggested Cromer was not a "decent guy" and implied he was deserving of punishment on that ground. Overall, there was an abundance of comments that likely appealed to the jury's emotion and created a danger for the jury to convict Cromer based on the contents of the emotional conversation.

The second piece of unwanted baggage weighing against admission of the evidence was the risk of confusion of the issues. A substantial part of

---

*Jensen v. Schreck*, 275 N.W.2d 374, 384 (Iowa 1979) (requiring state action as element of due-process claim).

[6]Federal Rule of Evidence 403 is identical to our rule 5.403.

the recorded conversation dealt with whether "rape" or "date rape" occurred during the evening. As a part of the conversation, the parties discussed their respective definitions of date rape. Neither definition resembled the legal elements necessary to prove the crimes charged in this case. For example, N.S. opined that date rape was "taking advantage" of an intoxicated person. Yet, that view blurs the line between mere intoxication and the mental or physical incapacitation required by Iowa Code section 709.4(4). Additionally, Cromer finally acquiesced that he had "taken advantage" and that he would label his conduct as date rape if it had happened to his sister. No limiting instruction was requested nor given to the jury to explain that Cromer's admissions were not admissions to any of the crimes charged.

Based on the limited probative value and the potential for unfair prejudice, and considering the availability of the parties to testify as to their recollections of the evening independent of the telephone conversation, significant parts of the recording should not have been introduced to the jury. The State argues defense counsel strategically decided to admit the tape because it demonstrated Cromer's compassion, and even if this was poor strategy in hindsight, trial counsel did not fail in an essential duty. We disagree. Considering the critical issue presented to the jury, reasonably competent counsel would have objected to at least some of the statements in the recording and would have requested limiting instructions for many others.

2. *Improper opinions and arguments on legal standards.* Cromer next argues the tape recording contained inadmissible opinions expressed by N.S. Specifically, Cromer takes issue with the repeated and forceful declarations by N.S. that she was raped.

The State acknowledges N.S. has no memory of the events that took place at the motel, including the sex acts. Thus, her declarations that rape

occurred, even if sincere, were not based on personal knowledge. Such declarations of fact implicate our rule that testimony be "rationally based on the perception of the witness"—i.e., on personal knowledge. Iowa R. Evid. 5.701. Thus, N.S.'s belief she was raped should not have been admitted or, at the very least, was subject to a limiting instruction indicating those statements not based on personal knowledge are not proof of the element of incapacitation.

Further, under the circumstances, the recorded declarations by N.S. that she was raped could have been construed by the jury as an opinion Cromer was guilty. "[A] witness cannot opine on a legal conclusion or whether the facts of the case meet a given legal standard." *In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005). This rule is based on the belief that normally "jurors are fully capable of applying the facts of the case to the law provided to them by the trial judge." *Id.* Consequently, any opinion testimony that the facts meet the applicable legal standard fails the requirement that all opinion testimony be helpful to the trier of fact. *Id.* (citing Iowa Rs. Evid. 701, 702).

Although N.S. did not opine that Cromer was guilty of sexual abuse in the third degree, she did say "you guys raped me." In the absence of limiting instructions regarding the use of such evidence, assuming it is admissible, a foreseeable danger existed the jury would evaluate the statement as an opinion of Cromer's guilt of the crime charged. The danger of harm was enhanced because N.S. had no personal knowledge of what transpired at the motel due to her inability to recall. Such opinion testimony is not permitted by the rules of evidence, and consequently trial counsel had a duty to object, at a minimum, to the unlimited admission of such evidence.

**C. Prejudice.** Our determination that trial counsel failed to perform competently when the State offered the recorded conversation into evidence

does not completely resolve Cromer's ineffective-assistance-of-counsel claim.[7] Cromer must also show he was prejudiced by his counsel's failure to object to the recorded conversation. Specifically, Cromer must show a reasonable probability the result of the proceeding would have been different had his counsel objected. *Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008). " 'A reasonable probability is one that is "sufficient to undermine confidence in the outcome." ' " *Id.* (quoting *State v. Bayles*, 551 N.W.2d 600, 610 (Iowa 1996)).

Overall, our confidence that the verdict represents the type of justice demanded in criminal prosecutions is seriously shaken by the recorded conversation the jury was permitted to hear and consider in reaching its verdict. The recorded conversation contained a dramatic and emotional appeal for justice by the complaining witness, which the rules of evidence would not permit her to make as a witness at trial. This appeal had to influence the jury, just as it eventually influenced Cromer to respond. The jury must not be permitted to employ such an emotional approach when weighing the guilt or innocence of an accused. Without the inadmissible portions of the recorded conversation, the evidence of Cromer's guilt was far from compelling. Stripped to its core, the fighting issue at trial was one of the mental or physical capacity to consent, and the complaining witness was unable to explain her state of mind or describe the facts and circumstances that could help explain her state of mind at the critical times during the evening. The State was left to make its best case for guilt with key portions

---

[7]Cromer also argues many statements by N.S. constituted hearsay. He specifically points to statements when she quotes acquaintances' and friends' accounts of her level of intoxication and incapacitation while at the tavern on the night in question. The State responds that the record was replete with similar testimony and argues any error by trial counsel in this regard would have been harmless. Based on our resolution of the other grounds for Cromer's ineffective-assistance-of-counsel claim, we need not address this subissue.

of the emotionally charged appeal by the complaining witness, which clearly should have been excluded from consideration by the jury.

The only direct evidence of the incapacitation of the complaining witness outside of the recorded conversation came from a jailhouse informant. Yet, the informant was compensated for his testimony with a reduced sentence for crimes he had committed. Under all the facts and circumstances, a reasonable probability exists that the result would have been different had trial counsel objected to the inadmissible evidence, and our confidence in the verdict is sufficiently undermined so as to require reversal of the conviction. This conclusion is fully supported by the record before us on direct appeal, and a more developed postconviction record would not be helpful.[8]

**V. Conclusion.**

We conclude Cromer received ineffective assistance of counsel, which resulted in prejudice. Consequently, we are required to grant a new trial.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF CONVICTION REVERSED; SENTENCE VACATED AND CASE REMANDED FOR NEW TRIAL.**

All justices concur except Baker, J., who takes no part.

---

[8]Our determination trial counsel was ineffective in failing to object to admission of the audio recording renders Cromer's other ineffective-assistance claim moot.